| THIBODEAUX, Judge.
The plaintiff, William Brent Rose, urges us to increase the Office of Workers’ Compensation’s (OWC’s) grant of civil penalties under La.R.S. 23:1201(F); likewise, Rose asks that we grant the civil penalty provided for by La.R.S. 23:1125. Rose also entreats us to increase the OWC’s attorney’s fee award and, finally, he requests that we sanction Marico Partnership, Inc. for its non-_j2Conforming appellee brief. For the following reasons, we grant Rose’s requests for relief.

FACTS

On June 3, 1994, while performing duties within the course and scope of his employment with Marico Partnership, Inc., William Brent Rose — a “log cut-up operator” — was involved in a work-place accident. At the time of claimant’s accident, Rose stood beneath the chute of a forty-five foot (45’) long overhead debarking drum for the purpose of unplugging (ie. clearing accumulated waste buildup and debris from) the machine. At the same time, other Marico employees placed the cover back onto the drum and instantaneously caused nearly 2,500 pounds of wet wood chips to fall out of the drum and *466 onto Rose. The load’s weight thrust Rose forward on his knees, pinned him against a wall, and buried Rose up to his stomach in waste material. For the next twenty-five minutes, claimant was immobilized' as coworkers scurried to dig claimant out from under the load with their bare hands. Emergency medical technicians arrived and removed claimant from the scene on a stretcher.
Essentially, two physicians regularly tracked Rose’s condition. Dr. John E. Cobb was selected by Rose to be claimant’s primary care physician. Dr. Frederick Lionel Mayer was chosen by Marteo to monitor/examine Rose’s condition. Both doctors agreed that, on account of his work-place accident, Rose sustained lower back and knee injuries. However, each doctor generally disagreed upon the proper course of treatment.
1 oRose’s Lower Back
Rose’s lumbar spine MRI revealed that claimant suffered a central disc herniation/bulge/protrusion at L5-S1; likewise, the CT scan of Rose’s lumbar spine revealed a broad-based disc herniation at L5-S1. Not only was there a prominent anterior epidural space at L5-S1, but Rose’s SI nerve roots were also displaced — predominantly on the left side.
Neither doctor agreed upon the proper course of treatment due Rose. For instance, after examining Rose on October 10, 1994, Dr. Cobb concluded that claimant .would best benefit by “going forward with a definitive procedure;” accordingly, on October 28, 1994, Cobb requested written authorization from Marteo to proceed with a laminectomy, discectomy, and fusion with EBI at L5-S1 on the left side (i.e. surgical intervention upon Rose’s back). Marteo declined. The company then scheduled an appointment for Dr. Mayer to examine Rose on November 2, 1994. The following excerpt from Mayer’s November 2nd report illustrates the conflict:
There are several options of management alternatives which I have explained to the patient. The first option would be to live with his complaints for the present time. Another option would be surgical decompression of the L5-S1 disc by suction technique which I would not advise as this is not a technique that is recommended by the majority of orthopaedic surgeons throughout the United States. Open surgery consisting of laminectomy and discec-tomy at the L5-S1 disc space on the left could be an option, but based upon: (1) the minimal findings of the CT scan and MRI of the lumbar spine; (2) the sparsity of actual clinical findings on physical examination; and (3) the absence of any neurological abnormalities, I do not feel that the patient would respond in a positive manner to surgical intervention.
Recommendation: light duty work.
14Rose’s Left Knee
Rose’s left knee MRI revealed that claimant suffered a “probable contusion of the anterior tibia bilaterally, and joint fluid with a possible tear of the anterolateral meniscus.” Upon examining Rose and his left knee MRI, Dr. Cobb resolved that claimant may have sustained “an internal derangement or cartilage tear.” Dr. Cobb concluded that Rose would best benefit by going forward with an arthroscope of the left knee; accordingly, on June 19, 1995, Dr. Cobb requested written authorization from Marteo to proceed with- an arthroscope of Rose’s left knee. Marteo declined. The company then scheduled an appointment for Dr. Mayer to examine Rose on July 10, 1995. The following excerpt from Mayer’s July 10th report portrays the conflict:
My review of the MRI revealed no tears of the lateral or medial meniscus. One could consider arthroscopic examination of the left knee, although the patient’s clinical findings do not suggest [a] tear of the lateral meniscus.
After again examining both Rose and his left knee MRI, Dr. Mayer concluded in his September 21,1995 report that:
I have reviewed the MRI X-rays of the left knee previously and felt that they were negative. The patient at this time does not have any specific objective evidence of torn menisci or tom cruciate ligaments. He does have a minimal amount of effusion, suggestive of a possible inflammatory process ongoing. He does have crepitation *467 of both knees to a minimal degree. One could consider arthroscopic examination of the left knee, although the patient’s clinical findings do not suggest a tear of the lateral or medial meniscus.
Benefits Terminated
From June 3, 1994 until March 10, 1995, Marteo paid Rose $309.15 in weekly indemnity benefits; moreover, Marteo paid all of the medical bills Rose incurred during this period. The primary dispute underlying this ease arose 15principally because Marteo refused to pay benefits beyond March 10, 1995 since, in the company’s estimation, Rose was “exaggerating his condition” and was capable of returning to work after March 10th. Marteo also terminated Rose’s vocational rehabilitation services.
Rose Files Manifold Claims For Relief
On March 13,1995, Rose filed his claim for worker’s compensation benefits with the OWC; therein, Rose alleged that Marteo violated La.R.S. 23:1201 because it arbitrarily and capriciously terminated Rose’s benefits and failed to offer vocational rehabilitation services. Claimant asked that the OWC order Marteo to resume Rose’s benefits, pay a statutory penalty and pay attorney’s fees.
Rose filed several amending and supplemental petitions shortly thereafter. Those petitions requested benefits, penalties, and attorney’s fees for Marteo’s failure to timely furnish medical reports, for its refusal to reimburse Rose for out-of-pocket expenses incurred in obtaining treatment from Dr. Richard Lafleur, and for Martco’s arbitrary refusal to authorize back and knee surgery recommended by Dr. Cobb.
Hearing Held and Judgment Rendered
Rose’s claims came to be heard on the 2nd and 25th days of October 1995. On October 31, 1995, the OWC issued a judgment which stated in pertinent part as follows:

Out-Of-Pocket Expenses:

1) Rose is entitled to treatment with his choice of general practitioner, Dr. Richard Lafleur.
2) Dr. Lafleur’s treatment is considered reasonable and necessary; thus, Marteo must reimburse Rose for the |6out-of-pocket expenses Rose incurred in obtaining such treatment.
3) Marteo was arbitrary and capricious in denying claimant’s treatment with Dr. Lafleur; therefore, Marteo must pay Rose $1,000.00 in attorney’s fees and $1,000.00 as a penalty.

Benefits Termination and Vocational Rehabilitation Services:

4) Rose is capable of light duty work, however; Marteo failed to provide light duty or to offer other vocational rehabilitation services;
5) Rose is entitled to receive supplemental earnings benefits (SEB) in the full amount, less a credit for any amounts actually earned from March 10, 1995 through October 25,1995;
8) Marteo was arbitrary and capricious in failing to reinstate indemnity benefits and in failing to provide vocational rehabilitation services. Rose is awarded a penalty of $1,000.00 and attorney’s fees of $2,000.00 for these actions.

Surgery Authorization:

9) Rose is entitled, at his discretion, to undergo back and knee surgery. In the event that he chooses to undergo surgery, he shall be entitled to receive temporary, total, disability benefits for any periods he is determined by his treating physician to be unfit for duty;
10) Marteo was arbitrary and capricious for failing to authorize surgery. Rose is awarded a penalty of $1,000.00 and attorney’s fees of $2,000.00 for these actions.

Medical Report Copies:

11) Marteo failed to timely provide claimant with certain medical reports. Claimant is awarded attorney’s fees of $500.00.
|7In his devolutive appeal, Rose assigns error to the hearing officer’s failure to award Rose:
1) an La.R.S. 23:1125 civil penalty on account of Martco’s failure to timely provide claimant with medical reports requested;
*468 2) an appropriate amount of La.R.S. 23:1201.2 attorney’s fees;
3) the “greater amount” of La.R.S. 23:1201(F) penalties on account of Martco’s arbitrary and capricious:
(a) refusal to reimburse Rose for the out-of-pocket expense he incurred in obtaining treatment from Dr. La-fleur;
(b) termination of benefits and vocational rehabilitation services; and,
(c) refusal to authorize the surgery recommended by Dr. Cobb.
Marteo declined to appeal the OWC’s judgment; however, the company fashioned error assignments within its appellee brief. On May 13, 1996, Rose petitioned this court to strike Martco’s “non-conforming” brief. We address each assignment (as well as Rose’s motion to strike) in turn.

LAW & DISCUSSION

Medical Report Copies and Section 1125’s Penalty
Rose insists that the OWC erred in failing to award the civil penalty set forth in La.R.S. 23:1125, which provides:
Whenever an employee, whether injured or not, shall at the request of the employer submit to any type of medical examination and a medical report is received by said employer, such employee, or his representatives, shall be entitled to a copy of the written report of the results of said examination within thirty days from the date of written demand upon the employer for such report. Such written report shall be furnished to said employee, or his representative at no cost to the employee and shall be in writing and signed by the professional medical or | «paramedical examiner performing such examination. Any employer who without just cause fails to furnish smh report to an employee so requesting same within the thirty day period provided above shall be liable to the employee for a civil penalty in the amount of $250.00, plus a reasonable attorney’s fee for the collection of such penalty. (Emphasis ours).
The record reflects that at Martco’s behest, Dr. Frederick Lionel Mayer examined Rose on three separate occasions between June 3, 1994 and March 16, 1995. After each visit, Mayer prepared a written report of his findings. On June 9th and August 23, 1994, Rose requested that Marteo provide him with Dr. Mayer’s medical reports. Though Mari-co received Mayer’s reports typically within a month of Rose’s examination, the company failed to furnish Rose with his copies until March 16, 1995 — nearly eight (8) months after claimant requested them. Clearly, Mart-co violated Section 1125. Though the OWC awarded $500.00 in attorney’s fees, the hearing officer failed to grant the $250.00 penalty sought by Rose.
The language of Section 1125 is clear: when an employer receives its employee’s written demand for a copy of her/his medical report and fails — without just cause — to furnish such copy within 30 days, that employer must pay a $250.00 penalty to the employee plus a reasonable attorney’s fee. Marteo utterly failed to prove “just cause;” accordingly, the OWC was compelled to award both attorney’s fees and the statutory penalty. In these instances, hearing officers lack discretion to choose between awarding attorney’s fees or penalties since Section 1125 mandates that both be granted. See Fusilier v. Slick Constr. Co., 94-11 (La.App. 3 Cir. 06/01/94); 640 So.2d 788. Therefore, the OWC erred in failing to award Rose a $250.00 penalty. We now order Marteo to pay Rose $250.00 as a Section 1125 penalty plus legal interest thereupon from the date of judicial demand until paid.
19Statutory Penalties: La.R.S. 23:1201(F)
Rose next maintains that in three specific instances the OWC erred in awarding “the lesser” amount of statutory penalties under La.R.S. 23:1201(F), which provides in pertinent part:
Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid to *469 gether with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. (Emphasis added).
Any period exceeding 40 days triggers Section 1125’s $2,000.00 cap.
Instance I: Out-of-Pocket Expenses. As hereinbefore stated, the OWC declared that Dr. Lafleur’s treatment was reasonable and necessary; accordingly, the agency ordered Marteo to pay a $1,000.00 penalty. Rose assigns error to the agency’s $1,000.00 penalty; to wit, he claims that the OWC was compelled to award $50.00 per day (up to $2,000.00) for each day in which Rose’s medical benefits remained unpaid because an amount awarded in this fashion would have accorded claimant “greater relief’ under the statute.
The record reflects that on March 31,1995, Rose received treatment from Dr. Lafleur at a cost of $35.00. Rose paid this expense from his own pocket. Marteo did not reimburse Rose until the OWC ordered Marteo on October 31, 1995 to reimburse Rose for his out-of-pocket expenses. Clearly, the intervening period between March 31st and October 31st exceeds 40 days. Accordingly, Rose contends that the OWC’s $1,000.00 penalty is inadequate since, under these facts, Section 11012Q1(F) compelled the OWC to award a $2,000.00 penalty[1] and, thereby, afford claimant “greater relief.” We concur.
Under La.R.S. 23:1201(F), hearing officers lack discretion to arbitrarily fix the penalty award. In this instance, the officer’s method for arriving at her $1,000.00 penalty figure conspicuously defies and is clearly inconsistent with the plain method set forth in Section 1201(F). Accordingly, we grant the relief Rose seeks upon this portion of his second error assignment. Marteo is hereby ordered to pay Rose a $2,000.00 penalty plus legal interest thereupon from the date of judicial demand until paid.
Instance II: Benefits Termination. As hereinbefore stated, the OWC held that Marteo was arbitrary and capricious in both failing to reinstate Rose’s indemnity benefits, and in failing to provide claimant with vocational rehabilitation services; accordingly, the agency ordered Marteo to pay a $1,000.00 penalty for its actions. Rose assigns error to the OWC’s $1,000.00 penalty for precisely the same reasons articulated in the foregoing instance—viz., Section 1201(F)’s $2,000.00 cap would have afforded Rose “greater relief.”
The record reflects that Marteo failed to provide benefits from March 10, 1995 until the OWC’s judgment of October 31, 1995, ordered Marteo to pay claimant SEB less any amounts Rose earned from March 10th through October 25,1995. Rose’s average weekly wage was $463.50. The parties stipulated that his weekly workers’ compensation rate was $309.15. OWC’s judgment ordered SEB in the “full amount.” From March 10, 1995 through Octob'er 25, 1995 (33 weeks), Rose is entitled to a pre-deduction total of all SEB benefits of $10,201.95. Twelve percent thereof yields $1,224.23. The time span between March 10th and October 25th Jnexceeds 40 days. Clearly, the appropriate Section 1201(F) penalty is $2,000.00 as this sum affords claimant greater relief. Accordingly, we order Marteo to pay Rose a $2,000.00 penalty for this transgression plus legal interest from the date of judicial demand until paid.
Instance III: Surgery Authorization. As hereinbefore stated, the OWC found Marteo arbitrary and capricious for failing to authorize Rose’s back and knee surgery; accordingly, the agency awarded Rose a $1,000.00 penalty. Claimant assigns error to the OWC’s $1,000.00 penalty because purportedly Section 1201(F)’s $2,000.00 cap would have afforded Rose “greater relief.”
The record reflects that Dr. Cobb advised and sought Martco’s authorization for Rose to undergo back surgery on October 10,1994. The company contested Rose’s surgery until October 25, 1995, the completion date of the OWC proceedings. However, because the record contains no evidence of the surgery’s cost, we cannot fix the proper penalty award as we cannot yet determine the “greater *470 relief;” that is, we cannot yet determine whether 12% of the surgery's cost exceeds $2,000.00. Accordingly, we remand this portion of Rose’s claim to the OWC in order that the hearing officer may properly determine the appropriate Section 1201(F) penalty after eliciting the cost of Rose’s surgical expenditure, and comparing $2,000.00 with 12% of said expenditure. Thereafter, the agency must award the greater figure. If Rose has not yet obtained surgery, a reasonable estimate of its cost, as determined by the hearing officer, will suffice.
Attorney’s Fees
Rose next contends that, given the nature, complexity, and amount of work involved in prosecuting claimant’s action, the OWC erred in granting only 112$5,500.00 in attorneys fees. Rose asks that we increase the OWC’s award to $20,000.00.
In worker’s compensation cases, we consider the following- factors in awarding attorneys fee:
(1) the degree of skill and ability exercised;
(2) the amount of the claim;
(3) the amount recovered; and,
(4) the amount of time devoted to the case.
Hood v. C.J. Rogers, Inc., 94-1162 (La.App. 3 Cir. 03/08/95); 654 So.2d 371 (citing Naquin v. Uniroyal, Inc., 405 So.2d 525 (La.1981)).
The record reflects that claimant’s counsel advocated Rose’s rights zealously. He researched the law thoroughly and devised recovery avenues. On four separate occasions, Rose’s counsel amended claimant’s petition and, thereby, added further theories of relief upon which Rose eventually recovered. Counsel prepared and attended five discovery depositions, corresponded with opposing counsel, and spent time meeting with both his client and expert witnesses. After two days of trial involving twelve (12) live witnesses, five (5) trial depositions, and some forty-one (41) exhibits, counsel emerged with favorable results for his client. On appeal, counsel prepared an effective brief outlining the legal and factual issues. Counsel obtained greater relief on appeal. Rose received representation that was both time consuming and effective. Given the foregoing circumstances, we conclude that an additional $12,000.00 attorney’s fee award is reasonable. Martco is hereby ordered to pay Rose an additional $12,000.00 in attorneys fees plus interest from the date of judicial demand until paid.
| ^Sanctions
Finally, Rose contends that Mart-co’s appellate brief violates Rule 2-12.5 of the Uniform Rules of Louisiana Courts of Appeal, which provides:
Appellee’s Brief. The brief of the ap-pellee shall conform to the requirements for the appellant’s brief as set out in the preceding Rule, except that a statement of the jurisdiction, the facts and of the issues need not be included unless the appellee considers the statements of the appellant to be insufficient or incorrect. It should contain appropriate and concise answers and arguments and reference to the contentions and arguments of the appellant.
In particular, Rose explains that Martco’s brief fails to set forth appropriate and concise answers to and arguments upon Rose’s error assignments; instead, Martco lodges its own error assignments in brief — even though the company failed to appeal the OWC decision under La.Code Civ.P. art. 2121 or Article 2133. Accordingly, Rose moves this court to sanction Martco by striking the company’s error assignments under Rule 2-12.13 of the Uniform Rules of Louisiana Courts of Appeal, which provides:
Non-Conforming Briefs; Sanctions. Briefs not in compliance with these Rules may be stricken in whole or in part by the court, and the delinquent party or counsel of record may be ordered to file a new or amended brief.
The appellate panel has vast discretion to determine whether Rule 2-12.13 sanctions should be imposed against an offending party. Williams v. Fischer, 439 So.2d 1111 (LaApp. 1 Cir.1983). This court may simply strike Marteo’s brief, or we may strike the company’s brief and order it to file another. See Williams 439 So.2d 1111. Because Martco assigns errors in brief without fashioning a timely appeal, we feel that striking Martco’s brief is prudent. Accordingly, we *471 will not consider any of Martco’s error assignments as such have been stricken.
| .¿CONCLUSION
In light of the foregoing discussion, we hereby order Martco to pay Rose $250.00 as a Section 1125 penalty, two Section 1201(F) penalties of $2,000.00 for the company’s arbitrary and capricious SEB termination and its refusal to reimburse Rose for an incurred medical expense, and an additional $12,000.00 in attorney’s fees. Moreover, we remand this cause to the OWC for the limited purpose of determining whether vel non 12% of Rose’s surgical expense exceeds or is less than $2,000.00. Based upon its finding, the OWC shall award the “greater remedy” consistent with Section 1201(F). Martco is east for the costs of this appeal.
AMENDED & AFFIRMED.
AMY, J., concurs in part and dissents in part and assigns reasons.

. Clearly, 12% of $35.00 is far less than $2,000.00.